[Civ. No. 67339. Second Dist., Div. Seven. Nov. 23, 1983.]

ELIZABETH S. HERRICK et al., Plaintiffs and Appellants, v.
THE STATE OF CALIFORNIA et al., Defendants and Respondents.

COUNSEL

John B. Mestad for Plaintiffs and Appellants.

John K. Van de Kamp, Attorney General, N. Eugene Hill, Assistant Attorney General, Henry G. Ullerich and Christopher C. Foley, Deputy Attorneys General, for Defendants and Respondents.

## OPINION

**JOHNSON, J.**—Plaintiffs are participants in the State of California deferred compensation plan. The essence of their complaint is that the method by which the state assesses and collects the administrative costs of the plan from the participants violates the fiduciary duty owed to the participants by the state as trustee of the deferred compensation funds and violates the terms of the plan itself.

The trial court ruled that no trust relationship existed between the state and the plan participants and that the method of assessing and collecting administrative costs did not violate the terms of the plan. We affirm.

I. The Nature and Operation of the Deferred Compensation Plan.

In 1972, the Legislature authorized the Department of General Services to establish a deferred compensation plan for officers and employees of the state. (Former Gov. Code, § 18310, now codified as § 19993.)

■ The purpose of the plan is to provide a tax advantage to state employees. By deferring receipt of a portion of wages, the employee defers taxation on those wages until they are actually received, usually upon retirement when the employee is in a lower tax bracket. Of course, for the plan to accomplish its purpose it must meet the requirements of federal income tax law. (26 U.S.C. § 457, 26 C.F.R. § 1.457-1 et seq.)

Under California's plan a state employee can elect to defer a portion of his or her salary each month and to have the state place that deferred compensation in an account with one of several investment companies. The minimum deferral is $20 per month; the maximum is set by IRS regulations. Withholding of deferred compensation is initiated by the employee executing an enrollment form and deferred compensation plan agreement.

The accounting procedure involved in the transfer of deferred compensation funds is as follows: on payday the total withheld for all participants in the plan is placed in a special deposit account. A computer listing of the amounts withheld is sent to the Office of General Services where it is re-

viewed before that office prepares a claim which initiates the issuance of checks to the investment companies receiving the funds.

During the seven to nine days it takes to perform these accounting procedures, the total deferred compensation of all participants is held in a fund known as the surplus money investment fund. While in this fund, the investment monies earn interest. Twice a year this interest is transferred to the deferred compensation plan. At the time of trial the total interest earned from the surplus money investment fund exceeded $200,000.

The coordinator of the deferred compensation plan testified that all of the above interest was used to help defray the cost of administering the plan. The other source of revenue for meeting administrative costs is a uniform assessment against each plan participant. The coordinator testified that originally this assessment was $1 per month. In March 1979 the charge was reduced to 50 cents per month. The reduction in the monthly assessment for administrative costs was made possible by increased participation in the plan and the use of the interest earned on deferred compensation while in the surplus money investment fund.

The coordinator testified further that the participants in the plan have never received an accounting of the costs of administration of the plan nor are they informed that interest transferred from the surplus money investment fund is used to defray costs of administration.

The evidence established that it costs no more to administer the plan for a participant with a $500 monthly deduction than for one with a $100 deduction.

Plaintiffs contend that the deferred compensation plan creates a trust with the employee as the trustor/beneficiary and the state as trustee. In failing to account to the employees for the interest on their deferred compensation while it rests in the surplus money investment fund, the state has breached its fiduciary duty to the trust beneficiaries. Plaintiffs also contend that use of that interest to defray administrative costs violates the terms of the deferred compensation plan and the agreement for reason we will detail below.

## DECISION

**II. The Deferred Compensation Plan Is Not a Trust.**

Sections 2221 and 2222 of the Civil Code require, as prerequisite to the creation of a voluntary trust, an intention on the part of the trustor to create

a trust and acceptance or acknowledgment of the trust by the purported trustee.

No testimony was offered at trial that plaintiffs or any other participant intended to create a trust or that the state had accepted the role of trustee. ■ Plaintiffs correctly point out that the intention of the parties to create a trust can be shown by extrinsic evidence. (*Hansen* v. *Bear Film Company, Inc.* (1946) 28 Cal.2d 154, 175 [168 P.2d 946].) Here the only evidence of intent offered by the plaintiffs was the plan itself and an accompanying explanatory booklet. That evidence fails to establish an intent on the part of the participants to create a trust.

We have no doubt that the participants in the plan have entrusted a portion of their compensation to the state for the purpose of investment. They reasonably expect the state to make the investment described in the plan and to exercise good faith in selecting those investments. ■ Nearly all contracts embrace a certain degree of "personal confidence" (Civ. Code, § 2216) but it does not follow that every contract creates a trust. (*Eaton* v. *City of Los Angeles* (1962) 201 Cal.App.2d 326, 331 [20 Cal.Rptr. 456].)

Initially we observe that it would be a unique transaction in which, as here, the purported trustee dictates all the terms of the trust including the kind and amount of property that can be placed in the trust (arts. II, V), the circumstances under which the trust can be revoked (arts. VII, XVII), the manner in which the trust res and income will be distributed (arts. XII, XIII, XV) and a disclaimer of any liability for failure to use reasonable care in the selection of investments (art. IX).

Furthermore, the provisions of the plan relating to ownership and use of the funds are inconsistent with a trust arrangement. ■ Under a trust, the trustee is vested with the title to the property and the beneficiary is vested with equitable ownership or a beneficial interest in the property. (*Taylor* v. *Bunnell* (1933) 133 Cal.App. 177, 181 [23 P.2d 1062]; *Estate of Feuereisen* (1971) 17 Cal.App.3d 717, 720-721 [95 Cal.Rptr. 165]; Bogert, Trusts and Trustees (1979 2d ed. rev.) § 181, p. 244.) In contrast, article X of the plan provides: "The State shall have the sole ownership of all investments made pursuant to this Plan and *no participant shall have any interest therein or the right to acquire the same.*" (Italics added.) Article XI further states, "All such investments shall be purchased or contracted for *solely* in the name of the State." (Italics added.) ■ And, contrary to the rule that trust property cannot be used to satisfy the personal debts of the trustee, (*Miller* v. *Miller* (1942) 55 Cal.App.2d 199, 205 [130 P.2d 438]; Bogert, *supra,* § 146, p. 54) the plan specifically provides in article X that the funds may be utilized for the general purposes of the state.

The enrollment form for the plan signed by each participant constitutes an agreement that his or her "rights hereunder shall be governed by the terms and conditions of the plan." ■■■ We agree with the trial court that the evidence produced by the plaintiffs fails to prove an intent to create a trust. In fact, it negates such an intent.

The plan provisions cited above also negate any intent on the part of the state to act as trustee of its employees' deferred compensation because those provisions are inconsistent with the obligations of a trustee. The rules on tax treatment of deferred compensation indicate that the state purposely avoided a trust relationship with participants in the plan.

In 1972, the Internal Revenue Service issued a revenue ruling that an employee would not be considered to have current income even though the employer set aside assets to fund its obligation to pay deferred compensation as long as the employee did not acquire a present interest in either the amounts deferred or the assets used as the employer's funding medium. The revenue ruling stressed that, "Under the agreement, neither the taxpayer nor his beneficiary has any interest in the account nor in any other assets of the employer, . . . The taxpayer and his beneficiary have only the right to receive the benefits under the deferred compensation agreement. [*This*] *agreement does not create* an escrow account or *trust fund* or any other form of asset segregation by the employer for the benefit of the employee." (Rev. Rul. 72-25, 1972—1 C.B. 127, quoted in CCH Stand. Fed. Tax Rep., § 6393.) (Italics added.) When California adopted its deferred compensation plan in 1972[1] it, presumably, was aware of this revenue ruling and designed its plan to meet the requirements for tax deferment contained therein.[2]

We conclude from the foregoing that the state did not accept its employee's deferred compensation to hold in trust and that if the plan was deemed a trust the income tax benefits, which are the very purpose underlying the plan, could be lost.

A comparison of the deferred compensation plan to the Public Employees' Retirement Fund (Gov. Code, § 20200 et seq.) also supports our conclusion that the former is not a trust. The Public Employees' Retirement Law (Gov. Code, § 20000 et seq.) establishes a retirement system providing pensions

---

[1] (See former Gov. Code, § 18310 (Stats. 1972, ch. 1370, § 5), now codified as Gov. Code, § 19993.)

[2] These requirements were subsequently codified as 26 United States Code section 457 (Pub.L. No. 95-600, 92 Stat. 2779, 1978). Section 457(b)(6) requires that deferred compensation plans for state employees must provide that all compensation deferred and all assets of the plan shall remain solely the property of the state, without being restricted to the provision of benefits under the plan, subject only to the claims of the state's general creditors.

and other retirement benefits for employees of the state and other public agencies. These benefits are mainly financed through contributions by the employee and employer which are placed in a fund known as the Public Employees' Retirement Fund. In contrast to the deferred compensation plan, the retirement fund "is a *trust fund* created, and administered . . . solely for the benefit of the members . . . ." (Gov. Code, § 20200.) Government Code section 20758 provides that the accumulated contributions to the fund "shall be held for the benefit of all such members of this system . . . ." Section 20181 states, "The obligations of this system to its members continue throughout their respective memberships . . . ." In *Valdes* v. *Cory* (1983) 139 Cal.App.3d 773, 788 [189 Cal.Rptr. 212], the court said of the state's obligation under the retirement system, "Once paid, [the] contributions constitute a trust fund held solely for the benefit of [the] members and beneficiaries . . . . Consequently, none of the funds . . . may be appropriated for a general public purpose . . . .

"Had the Legislature actually appropriated any of the . . . trust funds for purposes unrelated to the benefit of [the] members, e.g., to balance the state budget and avoid a year-end deficit, we would have no difficulty in concluding that such legislative action modified vested rights of [the] members." The same cannot be said of the deferred compensation plan which specifically authorized the Legislature to use plan funds "for the general purposes of the State." (Art. X.)

In summation, we find two critical elements of a trust are lacking from the plan: an intent on the part of the purported trustors to create a trust (Civ. Code, § 2221) and acceptance or acknowledgment of a trust on the part of the purported trustee. (Civ. Code, § 2222.) We find two elements, inconsistent with a trust, to be present: authorization to use the funds for the general purposes of the state and exclusion of the purported beneficiaries from any interest in the plan funds.

■ III. The State Has Not Breached the Terms of the Plan With Respect to Administrative Costs.

Article XVI of the plan provides that the director "shall withhold or collect" the administrative costs of the plan "in such manner as he deems equitable either (1) from the compensation deferred pursuant to the Plan, the income produced from any investment with respect thereto, or from principal returned from any investment, whether or not augmented, or (2) from the organization receiving such investments, where required by law to collect therefrom, or if not so required, where mutually satisfactory to such organization and the Director, or (3) by direct charge to the participants. . . .

"Annual statements of accounts distributed to participants shall specify any amounts deducted by the State, or by an organization contracting with the State in connection with this Plan, from deferred compensation of such participants or income derived therefrom, for costs pursuant to this Article."

The director uses two methods to meet the administrative costs of the plan. One is to assess each participant a uniform amount each month. This amount is deducted from the participant's paycheck and does not form a part of the deferred compensation. Plaintiffs do not object to this method. The second method is to use the interest earned on the deferred compensation and the administrative cost assessment during the time they are in the surplus money investment fund. Plaintiffs contend that this second method of defraying administrative costs violates the plan or the agreement between the state and the plan participants in four respects.

First, plaintiffs contend that interest earned on deferred compensation while it is in the surplus money investment fund cannot be used to defray administrative costs. They cite a provision in the agreement which states, "The employee understands that increments to the principal of his investment by way of interest, dividends, or otherwise will be automatically reinvested in the same manner as the principal." According to plaintiffs this provision means that if a participant elects to invest his deferred compensation in A Company all interest earned by that deferred compensation must also be invested in A Company. We disagree. We believe the provision simply means that all interest, dividends, or other increments earned by the participant's investment in A Company will be automatically reinvested in A Company.

Second, plaintiffs contend that interest earned on deferred compensation from any source cannot be used to defray administrative costs because the agreement restricts the state to using salary deductions for that purpose. The agreement provides "The employee agrees that expenses incurred by the employer in its administration of the plan, shall be shared by all participants, through deduction to their salary or wages." We do not read this provision as precluding the state from using other methods authorized in the plan for meeting administrative costs. In the agreement, the participant agrees that his or her rights "shall be governed by the terms and conditions of the plan." Article XVI of the plan authorizes the state to collect administrative costs "from the compensation deferred . . . [or] the income produced from any investment with respect thereto . . . ." We deem placement of deferred compensation in the surplus investment fund to be an investment for purposes of this provision.

Third, plaintiffs complain that the state has used income derived from deferred compensation funds for the cost of administration without any accounting of that income to the participants as required under the plan. "Annual statements of accounts distributed to participants shall specify any amounts deducted by the State . . . from deferred compensation of such participants or income derived therefrom, for costs pursuant to this Article." (Art. XVI.)

If "income" as used in this sentence means earnings from money temporarily transferred to the surplus money investment fund, then an accounting of that income used for administrative costs might be in order. We concluded earlier, (*ante* p. 164) that interest on plan funds transferred to the surplus money investment fund could be used for administrative costs under the provision of article XVI authorizing administrative costs to be collected from compensation deferred pursuant to the plan or "the income produced from any investment with respect thereto, . . ." ■ It is well settled, at least as to statutory law, that a word given a particular scope or meaning in one portion of a law shall be given the same scope and meaning in other portions of the law. (*Stillwell* v. *State Bar* (1946) 29 Cal.2d 119, 123 [173 P.2d 313].)

On the other hand, the accounting provision could be interpreted to apply only to income derived from the permanent investment of the participant's deferred compensation in the investment plan he or she has chosen. This construction is supported by two equally well-settled rules. ■ The first rule is that the acts of the parties subsequent to the execution of the contract, and before any controversy has arisen as to its effect, may be looked to in determining the meaning of words in the contract. (1 Witkin, Summary of Cal. Law (8th ed. 1973) Contracts, § 527, pp. 449-450.) It is undisputed that the state has never provided the plan participants with an account of the income earned from the surplus money investment fund. It has, however, always advised the participants of the money taken from their paychecks from administrative costs.

■ The second rule is that an administrative agency's interpretation of its own regulation deserves great weight and will be upheld if not clearly erroneous. (*Andreadis* v. *Board of Trustees* (1976) 59 Cal.App.3d 344, 351 [130 Cal.Rptr. 652].) ■ The Legislature authorized a deferred compensation plan for state employees in Government Code section 18310 but left to the Department of General Services the task of establishing such a plan. The deferred compensation plan developed by that agency is analogous to a regulation. It cannot be said that the agency's interpretation of its own plan is clearly erroneous.

Money transferred to the "surplus" fund is transferred in an unsegregated lump sum. It remains in that fund for seven to nine days before being sent on to the participant's chosen investment. To determine the amount of interest from the "surplus" fund that is attributable to an individual participant would require more than merely dividing the total interest by the number of participants. The amount of deferred compensation varies between participants. Thus a separate calculation would have to be performed for each participant. (In June 1980 there were 11,078 participants in the plan.) It would also be necessary to subtract from the total interest paid by the "surplus" fund the amount attributable to the administrative cost assessment taken from each participant's paycheck. This assessment is not part of the participant's deferred compensation. Each such calculation would have to be performed with new figures each month to account for changes in the number of participants, and possible changes in the amount of compensation being deferred and changes in the interest rate paid by the "surplus" fund.

Theoretically, a computer program could be designed to perform these calculations. We have no idea how much it would cost to develop and operate such a program but we do know that the cost would be borne by the participants as an additional administrative cost. It is reasonable for the state agency to interpret the plan in a manner not requiring the generation of this additional administrative expense.

Finally, plaintiffs contend that the use of interest income to defray costs is not equitable because the costs of administration are not shared equally among the participants. To the extent administrative costs are met through interest earned by depositing deferred compensation in the surplus money investment fund, the participant who defers $500 a month bears a greater share of the burden than the participant who defers $100 a month. The director of the plan testified that it cost no more to administer the plan for the $500 deferment than for the $100 deferment.

The answer to this argument lies in article XVI of the plan which states, "[The director] shall withhold or collect, . . . such costs, in such manner *as he deems equitable . . . .*" (Italics added.) By executing the agreement to participate in the plan, the participants have agreed to be bound by the director's decision as to what constitutes an equitable allocation of costs. The broad discretion to determine what is equitable bows only to the requirement that the determination not be arbitrary or capricious. (See *Fleshman* v. *Heckler* (5th Cir. 1983) 709 F.2d 999, 1003.)

The administrative costs of the plan are met by a uniform assessment against each participant and by the interest earned by the "surplus" fund. Originally, each participant was assessed $1 a month for administrative

costs. Through growth in the number of participants and the use of the "surplus" fund, the agency was able to reduce this assessment to 50 cents per month. This reduction benefited all participants in the plan. If the director could not use the interest from the "surplus" fund to defray administrative costs or if he had to reduce the amount of interest he could use, then the assessment rate would have to be increased to make up for this lost income as well as for the increased administrative costs in determining each participant's share of the interest returned from the "surplus" fund. The increase in the assessment rate might well offset the increase in the amount of deferred compensation placed in the participant's chosen investment fund, keeping in mind that the deferred compensation is only held in the "surplus" fund for seven to nine days. Thus, we conclude that the methods selected for collecting administrative costs have a rational basis.

## DISPOSITION

The judgment is affirmed.

Schauer, P. J., and Paez, J.,* concurred.

---

*Assigned by the Chairperson of the Judicial Council.